# THE ATTORNEY GENERAL
## OF TEXAS
AUSTIN 11, TEXAS





GERALD C. MANN

ATTORNEY GENERAL

Honorable P. K. Birdwell, President
Sabine-Neches Conservation District
Tyler, Texas

Dear Sir:

Opinion No. 0-2403
Re: The Sabine-Neches Conser-
vation District has author-
ity to construct a reservoir
to impound the natural flow
of the Neches River for the
purpose of making such fresh
water available to dilute salt
water flowing and seeping into
the streams from the East Texas
oil field.

We have your letter of May 22nd calling for our opinion on the power of the Sabine-Neches Conservation District to construct a reservoir primarily for the control and dilution of salt water, now being put into the tributaries of the Neches River in an unregulated manner. There are several thousand oil wells located on the Neches River Watershed, many of which now produce salt water and all of which are potential producers of salt water. We understand that an artificial reservoir as contemplated by your district if built across one of the upper tributaries will enable you to dilute most of the present and potential production of salt water in such manner as to maintain the salt solution of the Neches River below a point harmful to the uses to which the water is ordinarily put. Your district was created "to conserve, store, control, preserve, utilize and distribute the storm and flood waters and the waters of the rivers and streams of the State, and such powers as may be contemplated and implied by the purposes of this provision of the Constitution and as may be conferred by general law, as well as by the provisions of this Act," (Sec. 1, Chapter 97, Gen. Laws, 44th Leg., Reg. Sess., S. B. No. 361). Section 59 of Art. 16 of the Constitution is the reference made in the statute to the Constitution. Section 59(a) of the Constitution provides:

"The conservation and development of all the natural re-
sources of this state including the control, storing, preserva-
tion and distribution of its storm and flood waters, and waters
of its rivers and streams, for irrigation, power, and all other
useful purposes, the reclamation and irrigation of its arid,
semi-arid and other lands needing irrigation, the reclamation
and drainage of its overflowed lands, and other lands needing
drainage." (Italics ours)

Section 59(c) of the Constitution provides in part:

"The Legislature shall authorize all such indebtedness as may be necessary to provide all improvements and the maintenance thereof requisite to the achievement of the purposes of this amendment, and all such indebtedness may be evidenced by bonds of such conservation and reclamation district to be issued under such regulations as may be prescribed by law . . ."

Section 1 of S. B. 361 provides:

" . . . Said district shall have and be recognized to exercise all the rights and powers of an independent governmental agency, body politic and corporate, to construct, maintain and operate, in the valleys of the Sabine and Neches Rivers and their tributaries, within or without the boundaries of such district, any and all works deemed essential to the operation of the district and for its administration in the control, storing, preservation and distribution to all useful purposes of the waters of the Sabine and Neches Rivers and their tributary streams, including the storm and flood waters thereof."

In the face of a finding on the part of the Sabine-Neches Conservation District Board, that the construction of the subject dam or reservoir is a function essential to the operation of the district in storing the waters for a useful purpose, it is our opinion the district undoubtedly has the authority to construct said reservoir. We are told that this finding is based upon the facts that the waters of the river are used for the irrigation of several thousand acres of rice lands; for the domestic supply of several cities; and for various industrial purposes. The salt water in the river presently constitutes a menace to these uses which would be eliminated by the reservoir. The statute clearly sets forth the power of the Board to conserve water for the purpose of irrigation and all other useful purposes. The conserving of the fresh water to dilute the salt water is unquestionably a conservation of the Neches River waters in aid of irrigation and such functions assuredly fall within the general clause "all other useful purposes".

Your second question is whether the district has authority to use said portions of Johnson and Bowles Creek channels as carriers for the salt water discharge from the wells to the reservoir. Johnson and Bowles Creek channels are tributaries to the Neches River water system, and whatsoever power the district has extends to these tributaries, as Section 1 of the statute describes the powers as extending to "the waters of the Sabine and Neches Rivers and their tributary streams". Subsection (1) of Section 13, S. B. 361, provides:

"The right of eminent domain is expressly conferred upon such district to enable it to acquire the fee simple title to and/or easement or right-of-way over and through, any and all lands, water or lands under water, private or public, within

and without such district, necessary or convenient to carry out any of the purposes and powers conferred upon such district by this Act."

Accordingly, if the district deems it necessary or - convenient to carry out its purposes, it may condemn and use the channels of Johnson and Bowles Creeks. Insofar as the proposed reservoir would back water up these tributaries, the district would be obliged to condemn the channels, and water rights adversely affected. The district would not be obliged of necessity to condemn the channels at points above the back water of the reservoir. The use of such portions of the channels would be by the operators disposing salt water into the streams, as distinguished from use by the conservation district. However, it would appear that if the district should conclude it convenient to its purposes to condemn the channels and water rights at such points, it could under its statutory authority do so.

Your third question requests information on the "type and legality of securities which would have to be issued by the district." You state that the securities would have as collateral a group of contracts between the individual operators and the district, providing for the payment of a monthly service charge. The contracts in turn to form a sound basis for financing, would no doubt have to provide for a lien on the properties of the operators involved, securing the payment of the charges. This is so because the power is specifically withheld from the district. However, subsection (m) of Section 13, S. B. 361, provides:

"The Board of Directors of said district shall prescribe fees and charges to be collected for the use of water, water connections or other service, which fees and charges shall be reasonable and equitable and fully sufficient to produce revenues adequate to pay, and said Board of Directors shall cause to be paid therefrom: (specifically enumerated purposes)." (Italics ours)

Sections 17 through 30, excepting 25, of S. B. 361 govern the issuance of obligations. Insofar as the proposed securities would be secured by contracts between the individuals and the district, the same would appear to be legal, and the district is at freedom to provide any type of security not in conflict with the specific provisions of the sections of the law referred to. As Section 30, S. B. 361, provides:

"This Act without reference to other statutes of the State of Texas, shall constitute full authority for the authorization and issuance of obligations hereunder . . ."

Your fourth question in effect is, whether operators not presently disposed to contract with the district may be forced to discontinue disposal of salt water into the streams, or be forced to enter into a contractual relationship with the district. As a practical matter in the event an injunction would issue against such an operator, he would probably be forced to

contract with the district, however, there is no legal method for forcing such an operator to contract with the district. Regarding the issuance of an injunction as against such an operator, we shall assume that he would presently be subject to an injunction disallowing further disposal of salt water into the stream. Such an injunction would issue by reason of the aggregate disposal now constituting a nuisance. After the reservoir is built, it is our opinion that such operator could not take advantage of the facilities offered by the district without payment therefor, notwithstanding his individual acts would not in and of themselves constitute a nuisance. Our courts have recognized a measure of joint responsibility among contributors to a nuisance. Equity in prevention of a nuisance will enjoin a single actor even though his single contribution does not constitute the nuisance. The actors may be sued severally or they may be joined. In 46 Cor. Jur. p. 781, Sec. 395, it is said:

"Where several persons contribute to the creation of a nuisance, they may be joined in a suit to abate the same, although each transacts his business, from which the nuisance flows, separately and without any connection with the others, and there is no joint intent or joint action; but under such circumstances it is not necessary that all persons contributing to the nuisance should be joined as defendants."

A principle of the case of Bartholomew v. Shipe (Com. App.) 251 S. W. 1031, is pertinent regarding the responsibility of individually acting contributors to a nuisance. In that case three defendants owned a stagnant pit and a complainant successfully sought an injunction to have the pit drained. One of the defendants proceeded to have it drained and incurred an expense of $300.00. On appeal the judgment required the other defendants to contribute to the expense. The court of equity here assumed jurisdiction properly to allocate the burden among the contributors to the nuisance. Can it be said that because one or two of the contributors had drained their respective amounts of water that the remaining contributions, being inconsequential, could not be enjoined, or if drained, that they would not have to pay for service. Judge German, in the Bartholomew case (supra), said:

"Being an equitable proceeding, the court, having acquired jurisdiction for the purpose of abating the nuisance could properly adjust all differences between the parties, to the extent of adjudging who was the real wrongdoer if all were not culpable, and decreeing an equitable contribution between those who had been required to incur expenses and costs for the benefit of all in abating the nuisance."

Where certain of the defendants, for the benefit of all, have undertaken preventive measures to eliminate the nuisance, we do not believe the

remainder may continue to add their respective portions of water to the stagnant pool, nor in this instance, salt water to the rivers even though their singular acts would not constitute a nuisance.

Yours very truly

APPROVED JUL 25, 1940

ATTORNEY GENERAL OF TEXAS

/s/ Gerald C. Mann

ATTORNEY GENERAL OF TEXAS

By  /s/ Hugh Q. Buck
Hugh Q. Buck
Assistant

HQB:BBB:LM

APPROVED
OPINION
COMMITTEE
BY /s/ BWB
CHAIRMAN